**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BAKERS OF PARIS, INC., Respondent.**

**No. 89–70050.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1990.

Decided April 8, 1991.

---

1428

David A. Fleischer, N.L.R.B., Washington, D.C., for petitioner.

Robert G. Hulteng, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for respondent.

Before TANG and BEEZER, Circuit Judges, and STEPHENS,* District Judge.

TANG, Circuit Judge:

The National Labor Relations Board ("Board") has petitioned for enforcement of its bargaining order issued to Bakers of Paris, Inc. ("Bakers" or "Company"), and reported at 288 N.L.R.B. 991 (1988). The issues before us concern the proper means of confronting non-English-speaking witnesses with prior statements written in English, and the use of interpreters in administrative proceedings. Bakers also challenges the Board's finding that at one time a majority of employees within the appropriate bargaining unit supported collective bargaining. In opposing enforcement, Bakers further contends the Board's bargaining order is not a proper remedy in light of the passage of time and the turnover in personnel occurring between the commission of the unfair labor practices and the issuance of the bargaining order. We conclude that the bargaining order must be enforced.

## FACTS AND PROCEDURAL BACKGROUND

Bakers is a production French bakery located in South San Francisco, California. In 1983 and 1984, the Company primarily employed immigrants from Southeast Asia who spoke little or no English. In September 1983, several Bakers employees met at the home of David York, a business agent of the Bakery and Confectionery and Tobacco Workers International Union, Local 24, AFL–CIO–CLC ("the Union"). In the days following, the Union obtained the signatures of many Bakers employees on English language authorization cards and on October 3, 1983 Bakers received a Petition for Representation Election from the Board. Two months later, on December 9, 1983, the Union lost in a secret ballot election.

Thereafter, the Union filed with the Board objections to the election and charges of unfair labor practices. A complaint issued; it was amended later to allege additional unfair labor practices occurring in 1984. On August 23, 1985, after 25 days of trial in 1984,[1] an administrative law judge ("ALJ") found that Bakers had committed extensive unfair labor practices both before and after the 1983 election, all in violation of section 8(a)(1) and (3) of the National Labor Relations Act ("the Act"), 29 U.S.C. 158(a)(1), (3).

The ALJ concluded specifically that Bakers had coercively interrogated employees regarding their union activities, threatened employees with layoffs, granted employees longer break periods and wage increases to induce them not to engage in union activities, and promised job promotions for the same purpose. The ALJ found, for example, that on September 15, 1984 a Bakers vice president, Gilles Wicker, interrogated employee Gia Tuong Phung regarding Phung's testimony during the early portion of the hearing before the ALJ. Wicker accused Phung of lying, then left him with a Vietnamese-speaking customer who intimated to Phung that his statements at the hearing had jeopardized his position with Bakers, but that he could repair the damage by amending his testimony.

The ALJ found further that while the hearing was in progress Bakers announced

---

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

1. The first nine days of the hearing took place between May 30 and June 15, 1984. After three more days of trial on August 15, 16 and 17, the administrative proceeding recessed until September 19. The final thirteen days of the hearing concluded on October 5, 1984.

to its employees that, because one of the charges against the Company involved wage increases, the Company would not raise wages during the course of the litigation, which was estimated to last from two to five years. The ALJ concluded that this message was a reprisal against employees for their exercising and pursuing rights of organization and redress under the Act.

Two additional examples of the unfair labor practices found by the ALJ involve employees Chi Van Hoang and Thanh Vinh Luu. Both employees played important roles in attempting to organize their co-workers. Hoang was fired sometime during November 1983, purportedly because he attended a social function after having called in sick. Shortly thereafter, Luu was isolated from most of his fellow employees when Bakers changed his working hours, supposedly to accommodate another employee's schedule. The ALJ determined that Bakers's reasons for these personnel decisions were pretextual, and that the decisions discriminated against the employees on the basis of their efforts to organize, in violation of section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3).

In determining a proper remedy, the ALJ noted that the Union had obtained valid authorization cards from a majority of employees in the bargaining unit before the filing of the election petition. Ultimately, the ALJ recommended the Board impose several remedial measures, including ordering Bakers to bargain with the Union.

After the ALJ issued his decision, Bakers filed its exceptions to the decision with the Board. On May 17, 1988, the Board adopted the decision of the ALJ in all significant aspects, including the ALJ's assessments of witness credibility, and issued the bargaining order recommended by the ALJ. On February 2, 1989, the Board petitioned this court for enforcement of its order. The Board's jurisdiction was founded on section 10(a) of the Act, and we have jurisdiction over the enforcement petition pursuant to section 10(e). *See* 29 U.S.C. § 160(a), (e).

## DISCUSSION

Bakers attacks the Board's order on four grounds: two concern administrative procedures, and two concern the substantive basis upon which the bargaining order is founded. We review each contention in turn. Before doing so, we note as a general rule that this court will conduct only a limited review of a Board order to determine whether the Board has correctly applied the law. *NLRB v. Island Film Processing Co.*, 784 F.2d 1446, 1450 (9th Cir.1986). The Board's factual findings are conclusive if substantial evidence in the record as a whole supports them. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e).

### A. Administrative Procedures

In opposing enforcement of the Board's order, Bakers challenges the ALJ's decision—adopted by the Board, 288 N.L.R.B. at 991 n. 1—that prevented the Company from confronting non-English-speaking witnesses with prior statements written in English. Bakers also contends that it was error for the ALJ not to disqualify two interpreters used during the administrative hearing.

### 1. Exclusion of Prior Statements

At the hearing before the ALJ, Bakers repeatedly sought to question witnesses called by the Board's General Counsel about prior statements that were written in English and signed by the witnesses. The witnesses who made these prior statements were present or past employees of Bakers. Although some understood English, they all testified in either the Cantonese or Vietnamese language with the aid of an interpreter.

The prior statements of these witnesses were of two types: those taken by the Board in the course of its investigation, and those taken by Bakers's counsel for purposes of conducting the Company's defense. In producing to Bakers the statements taken by the Board, *see* 29 C.F.R. § 102.118(b), the Board's General Counsel also produced translated versions of these

statements prepared in the native languages of the witnesses. Translated versions of the written English statements taken by Bakers's counsel were never offered at the hearing.

During the course of the hearing, Bakers was permitted to confront the General Counsel's witnesses with the native-language versions of the statements taken by the Board. However, the ALJ would not allow the English versions of these statements into evidence, and Bakers declined to offer the native-language versions. As to the statements taken by the Company, the ALJ consistently refused to allow Bakers to use these in any manner, whether as evidence in themselves, as tools to refresh the recollection of witnesses, or as topics on which to conduct cross-examination. The ALJ did indicate that he would allow Bakers's counsel to ask generalized questions based on the prior statements taken by the Company, such as whether a witness had ever said anything contrary to his or her testimony. At times, however, it appears that Bakers was prevented from asking even these types of questions. The Company contends that these evidentiary rulings were erroneous, and that these errors preclude enforcement of the Board's order.

■ In deciding whether to enforce the Board's decision, we assess whether the Board's evidentiary rulings were correct. *See NLRB v. Maywood Do-nut Co.,* 659 F.2d 108, 110 (9th Cir.1981); *Carpenter Sprinkler Corp. v. NLRB,* 605 F.2d 60, 66 (2d Cir.1979); *cf. NLRB v. International Bhd. of Elec. Workers, Local 77,* 895 F.2d 1570, 1573 (9th Cir.1990) (whether the Board correctly applied the law in arriving at its decision is a question for this court). Ordinarily, this is a matter of determining whether the Board properly applied the federal rules of evidence. *Maywood Do-*

*nut Co.,* 659 F.2d at 110 (in unfair labor practice hearings the Board shall apply the Federal Rules of Evidence to the extent practicable); 29 U.S.C. § 160(b). However, in those instances where the Board departs from the federal rules to promulgate its own particular rule of evidence, this court will first determine whether the departure from the federal rules constituted an abuse of the Board's discretion. *Maywood Do-nut Co.,* 659 F.2d at 110; *cf. NLRB v. Hudson Oxygen Therapy Sales Co.,* 764 F.2d 729, 731 (9th Cir.1985) (rules promulgated by the Board are reviewed solely for rationality, and for consistency with the National Labor Relations Act). Even when the Board has erred in the promulgation or application of a rule, however, we will decline to enforce the Board's order only when the error has prejudiced the responding party. *NLRB v. Heath Tec Div.,* 566 F.2d 1367, 1371 (9th Cir.), *cert. denied,* 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978). The burden of showing prejudice is on the party claiming injury. *Id.*

■ Looking first at the statements taken by the Board and produced to Bakers, we find that Bakers has made no attempt to show any prejudice resulting from the ALJ's decision not to admit into evidence the English-language versions of these statements.[2] Indeed, as noted, it appears that Bakers was able to question the witnesses regarding these statements. *Cf. NLRB v. Seine & Line Fishermen's Union,* 374 F.2d 974, 978–79 (9th Cir.) (responding party not prejudiced when allowed to question witnesses regarding prior statements taken by the General Counsel or by counsel for charging party), *cert. denied,* 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 261 (1967). Furthermore, neither the ALJ nor the General Counsel opposed having the translated, native-language versions introduced as evidence, presumably

---

**2.** We assume arguendo that the Board erred in not allowing Bakers to introduce into evidence the statements taken by the Board. Thus, we focus on whether Bakers shows any prejudice resulting from this error. *See Heath Tec,* 566 F.2d at 1371. We do not read the decision in *NLRB v. Doral Bldg. Servs., Inc.,* 666 F.2d 432 (9th Cir.1982), as establishing a per se rule of

prejudice that is applicable here. Unlike the company in *Doral,* Bakers was able to conduct cross-examination based on the statements taken by the Board. The only adverse evidentiary ruling regarding Bakers's use of these statements was that the Company could not introduce the writings themselves into evidence.

accompanied by the English versions. However, Bakers proffered only the English versions, which the ALJ rejected. Although questions may remain as to the basis for the ALJ's decision excluding this evidence, the absence of prejudice allows us to proceed to other arguments. *See Heath Tec*, 566 F.2d at 1371.

Turning to the statements taken by Bakers, we consider first the basis for the ALJ's evidentiary rulings which prevented Bakers from using these statements in any meaningful way. In order to do so, it is necessary first to review the means by which these statements were obtained. During the second week of March 1984, about three months after the election and ten weeks prior to the commencement of the administrative hearing, Bakers's counsel, Robert Hulteng, met with several Bakers employees regarding events preceding the election. Prior to these meetings, Hulteng showed the employees a written statement indicating that their appearance was entirely voluntary; he asked them to sign the statement if they were willing to talk. Once an employee signed, Hulteng would converse with the employee either directly in English or with the aid of an interpreter, depending on the particular employee's fluency in English. Hulteng would then prepare in English a written summary of what the employee said. Bakers's counsel would ask the employee to read over the statement, and to clarify any ambiguities with the interpreter. Alternatively, if the employee could not read the English statement, the interpreter would read the statement in a language familiar to the employee. If the employee agreed with the statement, he was then asked to sign it "under penalty of perjury." The interpreter signed an accompanying statement describing his participation in taking the employee's statement, and attesting to the accuracy of the translations.

As a basis for the ALJ's evidentiary rulings excluding these statements, the Board asserts that, because it would not be compelled to produce statements not taken in the declarant's native language, such statements may not be used in proceedings before the Board when they have been obtained by a responding party. This argument is based on the decision in *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), which is relevant in construing the Board's rules concerning the production to responding parties of prior statements given to the Board's General Counsel by witnesses called by the General Counsel. *See, e.g., The Broadway*, 267 N.L.R.B. 385, 386–88 (1983). This argument is faulty for several reasons, perhaps most notably in that the rules concerning production of statements given to the government were not intended to alter the rules of evidence. *See Palermo*, 360 U.S. at 346, 79 S.Ct. at 1221.[3] We are, in any event, compelled to disregard the Board's argument here because it does not appear to be the basis of the Board's decision affirming the evidentiary rulings of the ALJ. *See NLRB v. United States Postal Serv.*, 827 F.2d 548, 555 (9th Cir.1987) ("In Board cases, a court cannot affirm on any basis presented in the record, but must instead review only the rationale presented by the Board.").

■ The Board's rationale for preventing Bakers from using the statements it obtained from its employees is as follows:

> The [ALJ] based his rulings on the inability of a non-English-speaking-and-reading witness to authenticate his affidavits' contents as being his statement. Accordingly, the [ALJ] ruled that a translated copy in the witnesses' native language would be required for impeachment purposes. The Respondent declined to obtain official translations of its affidavits. We affirm the [ALJ's] ruling, which is in accord with *NLRB v. Doral Building Services*, 666 F.2d 432, 435 (9th Cir.1982).

288 N.L.R.B. at 991 n. 1. Although the Board would have us adopt its rationale, we cannot agree with this interpretation of the *Doral* decision.

---

**3.** The argument is also somewhat disingenuous in view of the Board's usual practice of taking English language statements from foreign-language-speaking affiants. *See* Reporter's Transcript at 1426, 1449.

In *Doral,* the court denied enforcement of the Board's order because the company was not permitted to cross-examine witnesses using "unofficial" English translations of prior written statements taken by the Board in Spanish, the witnesses' native language. 666 F.2d at 433. The *Doral* court ordered that "official" translations be prepared, and that the company be permitted to use them to cross-examine the witnesses who had given the statements. *Id.* at 435. Thus, the ability of the witnesses to authenticate their prior statements was never at issue in *Doral* because the original statements were written in the witnesses' native language. Instead, translations were necessary simply because the hearing was conducted in English—"no one at the hearing understood Spanish." *Id.*[4]

 There is no requirement under the Federal Rules of Evidence that a prior inconsistent statement be presented to a witness, let alone authenticated by him or her, before the statement is used as a topic for cross-examination. Although such a rule once existed, Federal Rule of Evidence 613(a) was drafted expressly to abolish it. *See* Fed.R.Evid. 613 advisory committee's note to subdivision (a); *United States v. Marks,* 816 F.2d 1207, 1210 (7th Cir.1987). Certainly the *Doral* opinion did not reinstate such a rule. Furthermore, nothing in *Doral* requires that the prior statement originally be recorded in the native language of the declarant. Of course, it is preferable to record prior out-of-court statements in a language which the declarant can read if the declarant is asked to sign the statement. Doing so lessens doubt about the declarant's understanding of any written statement that he or she adopts, and permits the accuracy of any translations prepared from the original writing to be tested later in an adversarial manner. But failure to follow this procedure, with the ensuing doubts concerning the declarant's understanding and the inability to verify at a later time translations made at the time of the writing, should not result in the exclusion of otherwise relevant evidence. Rather, these defects should simply be considered in weighing the effect of the prior statements on the credibility of the witnesses. *Cf. United States v. Villalta,* 662 F.2d 1205, 1206–07 (5th Cir.1981) (ability of witness to understand defendant's out-of-court Spanish statements was a question concerning weight to be given testimony rather than a question of witness's competence), *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 175 (1982).[5] The Board thus erred to the extent that it relied on the *Doral* case to prohibit Bakers both from questioning the General Counsel's witnesses about the statements taken by the Company, and from using the writings to refresh the recollection of the witnesses.[6]

 It remains to be considered whether Bakers suffered any prejudice as

---

**4.** In recognizing that translations of the native-language statements were necessary, the *Doral* court touched upon the need for the trier of fact in any judicial proceeding to consider the accuracy of the translations presented. Of course, the *Doral* court's requirement that the Board prepare an "official" translation will, in most instances, resolve the issue of translation accuracy—so long as the responding party does not challenge the translation. *Cf. International Medication Sys., Ltd.,* 274 N.L.R.B. 1197, 1199 n. 4 (1985) ("[A]bsent any Board rule defining 'official translation,' the certification of a Board employee that he is bilingual and that he has translated the matter to the best of his ability appears to be as 'official' as the Board can get."). But the issue might remain open in cases where an alternative translation is offered or where, as here, a prior foreign-language statement was transcribed only in English.

**5.** Similarly, the qualifications of the interpreter used in taking the prior statements, such as whether he or she is "court-certified," *see* 28 U.S.C. § 1827, should be considered in weighing the degree to which the prior statement impeaches the witness. Contrary to Bakers's assertions, court certification does not amount to a declaration of an interpreter's infallibility.

**6.** Similarly, the decision in *Doral* does not require a party to use a native-language version of a prior statement when seeking to admit the writing itself into evidence pursuant to Federal Rule of Evidence 613(b). Nevertheless, under the federal rules, authentication of the writing is necessary if it is to be admitted into evidence. *See United States v. Stanfield,* 521 F.2d 1122, 1127 (9th Cir.1975). Because neither the Board nor Bakers discuss this requirement in any detail, we are unable to consider whether the Board erred in excluding the writings themselves.

a result of the Board's erroneous evidentiary rulings. *See Heath Tec,* 566 F.2d at 1371. To begin with, we reject the suggestion that the *Doral* decision established a per se rule of prejudice applicable here. Unlike the responding party in *Doral,* which was prevented from cross-examining the General Counsel's witnesses based on prior statements obtained by the General Counsel, Bakers was prevented from using statements which it had obtained for itself from its employees. This distinction is especially apt in light of two considerations. First, there is no indication that Bakers followed the Board's Rules and Regulations for taking depositions, *see* 29 C.F.R. § 102.30, in taking the statements in question. The Company therefore had no basis for requesting the declarants to sign their statements "under penalty of perjury." *See* 70 C.J.S. *Perjury* § 21 ("A voluntary oath neither required nor authorized, that is, not provided for, by law, cannot constitute perjury."). Second, this case includes a finding, not disputed here, that Bakers's vice president attempted to coerce an employee into changing his testimony before the ALJ.[7] Under these circumstances, we hold Bakers to the requirement that it show prejudice resulting from the evidentiary rulings in question in order to avoid enforcement of the Board's order.[8]

■ Bakers attempts to show prejudice with respect to three of the General Counsel's witnesses, Gia Tuong Phung, Nhon Nang La, and Xuan Duong. First, the Company argues that it was prejudiced in not being able to cross-examine Gia Phung concerning his prior statement because this statement contradicted Phung's testimony that during an October 1983 meeting with employees Vice President Wicker had threatened to close the plant if the Union

won the election. *See* Reporter's Transcript ("RT") at 1097. In fact, the Board found that the Company had threatened to shut down the bakery at this meeting. 288 N.L.R.B. at 991. However, even if Phung made contradictory statements regarding what was said at the October 1983 meeting, the Board gave little credit to Phung's testimony beyond his account of events occurring in September 1984. *Id.* at 991 n. 2, 1001. Therefore, Bakers was not prejudiced by the ALJ's ruling preventing the Company from asking Phung about his prior statements regarding the 1983 meeting.

■ Turning to the testimony of Nhon Nang La: Bakers contends the "central theme" of La's testimony was the status of two other employees, Michael Nguyen and Thanh Quan "Fred" Phung, as statutory supervisors under section 2(11) of the Act, 29 U.S.C. § 152(11). Indeed, La did testify about who he regarded as his supervisor, about the extent to which his work was supervised, and about work performed by Michael Nguyen and Fred Phung. RT at 1316–33. In particular, La indicated that he worked in the packing department, and that his supervisor was Jackie Jegat. *Id.* at 1316–17. La also testified that he could not remember whether Nguyen spoke to him about the Union. *Id.* at 1375. In view of this testimony, Bakers argues that it was prejudicial for the ALJ not to allow the Company to examine La about his prior statements that Michael Nguyen and Fred Phung were packaging department supervisors, and that Nguyen spoke to La about the Union. We disagree.

During La's testimony, the ALJ remarked that "[w]e have the statutory definition and the issue [of supervisory status] is going to be tested in terms of duties and

---

7. Such tactics would be especially effective if the employer referred both to the employee's prior, allegedly inconsistent statements purportedly made under penalty of perjury, and to the penalties for perjury.

8. Indeed, such circumstances could well justify the exclusion of the proffered evidence. *See NLRB v. Maywood Do-nut Co.,* 659 F.2d 108, 110 (9th Cir.1981) (enforcing order wherein Board had "excluded evidence collected in a way which interferes with the smooth functioning of

the collective bargaining process"); *cf. NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 239, 98 S.Ct. 2311, 2325, 57 L.Ed.2d 159 (1978) (noting the long-recognized possibility of using pretrial discovery in labor proceedings for purposes of coercing employees). However, this is not the issue we are called upon to decide, nor may we decide it as an alternate ground on which to affirm the Board's ruling. *See United States Postal Serv.,* 827 F.2d at 555.

tasks of the individual at issue, so what remarks these other rank and file may have made are questionable as to what significance it has [sic]." RT at 1323. Thus, as the ALJ indicated, employee perception of an individual's role in an organization was by no means conclusive of statutory supervisor status. *See also id.* at 796. Although at one time La may have identified Michael Nguyen and Fred Phung as supervisors, the ALJ did not refer to employee perception at all in deciding whether Nguyen and Phung were statutory supervisors. *See* 288 N.L.R.B. at 1007–08. Bakers, therefore, has not shown that it was prejudiced in not being able to examine La concerning his statement that Nguyen and Phung were supervisors.

 Furthermore, Bakers's proffered questions concerning whether Nguyen spoke to La about the Union, and possibly asked La to sign an authorization card, are rendered irrelevant by our affirmance—discussed hereinafter—of the Board's finding that Nguyen was not a statutory supervisor. As a result of this finding, La's authorization card would have been valid regardless of whether Nguyen spoke to him about the Union. Thus, the Company was not prejudiced in not being able to ask La about his prior statement that Nguyen had spoken to him.

Finally, as to the testimony of Xuan Duong, Bakers argues it was prejudiced by the ALJ's ruling preventing the Company from asking Duong about four inconsistencies between his testimony and his prior statement obtained by the Company. These four inconsistencies concerned the following topics: (1) whether Wicker had asked Duong how he would vote in the election, (2) whether Wicker had delayed employee bonuses because of the election, and had indicated that bonuses would be contingent upon the outcome of the election, (3) whether, prior to the election,

Wicker offered all employees an increase in pay following the election, and (4) whether Wicker indicated that employees would be laid off and whether he threatened to close the bakery if the Union prevailed in the election.[9] However, as discussed below, Bakers was not prejudiced by the ALJ's rulings preventing the Company from asking Xuan Duong about his prior statement.

 First, with regard to whether Wicker asked Duong about how he would vote, the ALJ specifically discredited Duong's testimony that Wicker had made this inquiry. 288 N.L.R.B. at 1005. Thus, there could be no prejudice in not allowing Bakers to examine Duong about his prior statement that Wicker did not ask Duong about his union sentiments. Similarly, respecting whether Wicker had delayed employee bonuses and made them contingent on the outcome of the election, none of the unfair labor practices found by the Board and the ALJ were premised on a delay of employee bonuses.[10] Furthermore, the ALJ specifically found Bakers "ducked the temptation to link bonuses with a defeat of the Union". 288 N.L.R.B. at 1008. Thus, Bakers was not prejudiced by the ALJ's rulings preventing it from asking Duong about prior statements contradicting his testimony on these first two subjects. In fact, the Board ruled in favor of Bakers on the topics which the Company wished to raise with Duong during cross-examination.

 The third area in which Bakers sought to question Duong was whether, prior to the election, Wicker offered all employees an increase in pay following the election. On this issue, the Board found only that Bakers "promised hourly wage increases to *some* employees conditioned on the Union's election defeat and for similar reasons granted hourly increases to *two* employees." 288 N.L.R.B. at 991 (emphasis added). There was no finding that wage increases had been made or promised

---

**9.** The Board considered the threats of layoffs and plant closure as one unfair labor practice. *See* 288 N.L.R.B. at 998, 1008, 1009–10, 1012.

**10.** As previously mentioned, one unfair labor practice charge was based on the Company's July 13, 1984 announcement that it would delay

wage increases pending the resolution of this litigation. *See* 288 N.L.R.B. at 998, 1010. However, Duong's testimony concerning a delay in employee bonuses related to statements allegedly made by the Company on November 18, 1983. *See* RT at 1415–17.

to *all* employees. Furthermore, as to the employees who did receive increased wages, or promises thereof, the ALJ had substantial evidence on which to base these findings, wholly apart from Duong's testimony.[11] Thus, despite Duong's testimony that all employees had been promised a raise, Bakers was not prejudiced when the ALJ barred the Company from cross-examining Duong about his prior statement. Although the prior statement indicated that no employees had been offered a raise in wages, the Board's findings concerning wage increases need not be founded—and, indeed, probably were not founded—upon Duong's testimony.

■ Finally, the fourth issue on which Bakers wished to question Duong was whether on October 14, 1983 Wicker threatened to close the bakery, or whether Wicker ever indicated that employees would be laid off if the Union won the election. The Board concluded that such threats were made. 288 N.L.R.B. at 991. In testifying to such threats, Duong's account was corroborated by the testimony of Chi Van Hoang, RT at 873, whom the Board credited in full. 288 N.L.R.B. at 991 n. 2, 1001.[12] Because Hoang's testimony provides an independent ground for the Board's findings that Bakers threatened to lay off employees and to shut down, Bakers did not suffer prejudice as a result of not being able to cross-examine Duong concerning his prior statement in which he denied that the Company had ever threatened employees with layoffs or plant closures.

Bakers has shown no prejudice resulting from the Board's erroneous decision not to permit cross-examination of the General Counsel's witnesses based on prior statements taken by the Company. Accordingly, there is no reason here not to enforce the Board's order. *See Heath Tec,* 566 F.2d at 1372.

### 2. Biased Interpreters

■ Bakers also challenges the use of allegedly biased interpreters during the administrative hearings. Bakers charges that it was denied a fair hearing because of the appearance of impropriety in using interpreters who had been involved in preparing the General Counsel's case, and who had also had social contacts with some of the General Counsel's witnesses.[13] However, Bakers cites no statutory or administrative rule governing the disqualification of interpreters in proceedings before the National Labor Relations Board or other administrative bodies, and none has otherwise come to our attention. Instead, Bakers appears to advance the following two bases for the disqualification of the interpreters: first, an analogy to rules governing the disqualification of judicial officers, *see, e.g.,* 28 U.S.C. §§ 144, 455 (providing for disqualification of federal judges); 29 C.F.R. § 102.37 (providing for disqualification of ALJs in Board proceedings), and, second, the constitutional mandate of due process. Neither basis is sufficient to prevent enforcement of the bargaining order issued in this case.

■ We perceive in the Board's decision rejecting Bakers's arguments concerning the interpreters the embryo of a rule

---

**11.** For example, Gia Tuong Phung testified that in November 1983 Wicker handed him his paycheck, which included a 50 cent increase in his hourly wage, shortly after he had met with Wicker about the Union. RT at 1109–10. The ALJ apparently credited this testimony. *See* 288 N.L.R.B. at 1004. Furthermore, both Chi Van Hoang and Vinh Pham testified, RT at 887–89, 2095, and the ALJ so found, 288 N.L.R.B. at 1004–05, that Wicker promised them raises if they assisted in defeating the Union.

**12.** Bakers claims the ALJ's evidentiary rulings prevented the Company from thoroughly cross-examining Hoang concerning a pre-trial statement that Hoang gave to the Board's General

Counsel. *See* Respondent's Opening Brief at 17. However, in keeping with our prior discussion of the ALJ's decision not to admit into evidence prior written English statements taken by the General Counsel, we believe that Hoang's testimony is sufficient to corroborate the events to which Duong testified.

**13.** The Company also argues that the interpreters appeared biased, and should have been disqualified, because their fees were paid by the Board. We reject this argument; it is entirely frivolous. *See United States v. Lozano,* 511 F.2d 1, 6 (7th Cir.), *cert. denied,* 423 U.S. 850, 96 S.Ct. 94, 46 L.Ed.2d 74 (1975); *Chee v. United States,* 449 F.2d 747, 748 (9th Cir.1971).

governing the disqualification of interpreters from Board proceedings. *See* 288 N.L.R.B. at 991 n. 1 ("Absent a showing of erroneous or improper translations or other evidence of interpreter bias, we find that the Respondent has not demonstrated in its exceptions any evidence of bias on the part of the interpreters which would warrant a finding that it has been prejudiced by the [ALJ's] ruling.").[14] Ordinarily, rules adopted by the Board are reviewed solely for consistency with the National Labor Relations Act, and for rationality. *NLRB v. Hudson Oxygen Therapy Sales Co.*, 764 F.2d 729, 731 (9th Cir.1985). If the rule survives these inquiries, then the Board's application of the rule will be upheld if it is supported by substantial evidence on the record as a whole. *Id.* In reviewing the adjudicative promulgation and application of a rule, this court should not substitute its judgment for that of the Board. *See id.* (defining narrow judicial role); *Hawaiian Hauling Serv., Ltd. v. NLRB*, 545 F.2d 674, 676 n. 7 (9th Cir.1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977); *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 693–94, 100 S.Ct. 856, 867–68, 63 L.Ed.2d 115 (1980) (Brennan, J., dissenting). However, the adequacy of Board procedures is subject to plenary review when the procedures are challenged on due process grounds. *NLRB v. Ironworkers Local Union No. 505*, 794 F.2d 1474, 1477 (9th Cir.1986).

■ The Board's decision does not make clear the parameters of its interpreter disqualification rule. Whatever the nature of the rule, however, Bakers does not contend that it is inconsistent with the Act or that it is irrational. Furthermore, the Company does not challenge, on substantial evidence grounds, the Board's finding that the Company was not prejudiced by the ALJ's decision crediting the interpreters and their translations. *See* 288 N.L.R.B. at

991 n. 1. Instead, Bakers contends that the Board adopted the wrong interpreter disqualification rule, and that the correct rule precludes enforcement of the Board's order. Specifically, Bakers asserts that the appearance of impropriety in having interpreters who were substantially involved in the preparation of the General Counsel's case and who socialized on a limited basis with certain witnesses requires the disqualification of the interpreters and precludes enforcement of the Board's order. However, in reviewing a rule adopted by the Board, we will not substitute our judgment for that of the Board. *See Hudson Oxygen Therapy Sales Co.*, 764 F.2d at 731. We therefore will not interpose some other interpreter disqualification rule in place of the rule instituted by the Board. Thus, unless the Board's application of its interpreter disqualification rule in the present case denied Bakers due process of law, there is no basis on which to deny enforcement. To this due process issue we now turn.

In pressing its contentions, Bakers argues interpreters, like judicial officers, should be disqualified to avoid the appearance of impropriety. It may be that in deciding whether to disqualify an interpreter the analogy to judicial officers is appropriate in some instances, such as when the interpreter plays a role in which unreviewable error might occur, or when a party has a right to an interpreter at government expense. In such instances, the appearance of impropriety may require the disqualification of an interpreter. The present case, however, is not one in which a party would be unable to arrange for contemporaneous verification of the translations offered by the interpreters. The hearings were open to the public, *see* 29 C.F.R. § 102.34, and the witnesses for whom the interpreters translated testified

**14.** We note that it is a question left to the Board's discretion whether to promulgate a rule by way of administrative rule-making procedures or by adjudication. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *see Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328 (9th Cir.1982). Although procedural rules governing adminis-

trative proceedings may be better promulgated through the administrative rule-making procedures, we have no reason here to doubt the Board's authority in initiating the development of a rule governing the use of interpreters in Board proceedings. *See City of West Chicago v. United States Nuclear Regulatory Comm'n*, 701 F.2d 632, 646–47 (7th Cir.1983).

in languages known to many.[15] Furthermore, in this case the interpreters were called to testify about the circumstances which Bakers alleges as cause for disqualification. Bakers thus had opportunities not only to verify the accuracy of the translations, but also to interrogate the translators. Under these circumstances, we think that the role of interpreter is more properly analogized to the role of a witness, rather than to the role of a judicial officer. *See* 6 J.H. Wigmore, *Evidence* § 1824 (Chadbourn rev. 1976) ("an *interpreter* . . . is a kind of witness"); *cf.* Fed.R.Evid. 604 (analogizing interpreters and expert witnesses for purposes of determining whether interpreter is qualified). Accordingly, we conclude that the opportunity to conduct voir dire of the interpreters, thereby placing before the trier of fact the potential biases and the demeanor of the interpreters, afforded Bakers all the process that it was due under the circumstances. *See NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 5 n. 3 (1st Cir.1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *cf. Hoffa v. United States*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966) (testimony of government witness who had motive to lie was not constitutionally inadmissible where rigorous cross-examination occurred; instead, credibility of witness was a question for trier of fact). We thus find nothing regarding the interpreters used by the Board that prevents enforcement of the Board's order.

## B. Validity of the Bargaining Order

Bakers challenges the bargaining order issued by the Board on two additional grounds. First, Bakers contends substantial evidence is lacking insofar as the Board concluded the Union enjoyed the support of a majority of the bargaining unit. Second, Bakers asserts the Board did not sufficiently consider employee turnover and the passage of time in deciding to issue a bargaining order.

As we have said, this court will enforce a decision of the Board if substantial evidence supports the Board's findings of fact, and the Board has correctly applied the law. *NLRB v. International Bhd. of Elec. Workers, Local 77*, 895 F.2d 1570, 1573 (9th Cir.1990). Evidence is substantial when reasonable minds might accept it as adequate to support a conclusion, even if reasonable minds might also draw a second, inconsistent conclusion from the same evidence. *Id.* In assessing the substantiality of evidence in the context of adjudicating a petition for enforcement of a Board order, we must consider the record as a whole, taking into account whatever evidence in the record fairly detracts from the weight of the evidence relied on by the Board. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *International Bhd. of Elec. Workers, Local 77*, 895 F.2d at 1573.

### 1. Majority Support for Collective Bargaining

In this case, the Board premised the bargaining order in part on its finding that a majority of the employees in the bargaining unit at one time agreed to collective bargaining. 288 N.L.R.B. at 993. Majority status is usually necessary for a bargaining order to issue. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 596–97, 610, 614, 89 S.Ct. 1918, 1930–31, 1938, 1940, 23 L.Ed.2d 547 (1969) (indicating that authorization cards may be used to show majority status, that majority status need not be maintained in order to obtain bargaining order, and that to justify a bargaining order in certain instances requires "a showing that at one point the union had a majority"); *NLRB v. Ed Chandler Ford, Inc.*, 718 F.2d 892, 894 (9th Cir.1983) (enforcement of bargaining order denied because union never obtained majority status). Bakers challenges the Board's finding of majority status on three grounds. First, the Company argues certain employees who signed the authorization cards did not

---

**15.** In fact, Bakers did have its own translator monitor a portion of the proceedings. RT at 854–61, 1485. In addition, tape recordings of the foreign-language testimony were available for a year following the hearing. RT at 792.

understand what they were signing. In this regard, we will consider whether there was substantial evidence for the finding that the card signers understood the significance of the authorization cards. Bakers's second claim is that two of the authorization cards counted by the Board were actually signed by statutory supervisors. We thus review whether there was substantial evidence for the Board's finding that the two employees in question were not statutory supervisors. Because we sustain the Board's findings and conclusion in these regards, we do not reach Bakers's third argument that other authorization cards are invalid because they were solicited by the purported statutory supervisors.

### a. Understanding of Employees Who Signed English Authorization Cards

 The relevant bargaining unit in this case consisted of 28 Bakers employees. *See* 288 N.L.R.B. at 991 n. 4, 993 n. 16, 1006–08. The ALJ concluded that as of September 27, 1983, a majority of the unit, 22 employees, had signed valid authorization cards. *Id.* at 1008. The Board upheld the finding of majority status based on its conclusion that at least 17 of the authorization cards were valid. *Id.* at 991 n. 4. Nevertheless, Bakers continues to challenge the validity of several authorization cards based on the inability of certain employees to understand the English text printed on the cards they signed, and the absence of proof indicating that the significance of the cards was explained to these employees. Bakers challenges the cards signed by the following ten employees: Nhon Nang La, Wilson Ton, Minh Tran, Toha Dam, Ton Quan, Chi Van Hoang, Vinh Pham, Hang Nam, Trieu Tan Dao,

and Luong Mach. Respondent's Brief at 40.[16] The Board relied on all of these employees' authorization cards in adopting the ALJ's finding of majority status. *Id.* at 991 n. 4.[17] Substantial evidence need only support the validity of eight of these cards for us to uphold the Board's finding of majority status.[18]

 The general rule is that if an authorization card is unambiguous, the employee is presumed to have understood it. *See Gissel*, 395 U.S. at 584, 89 S.Ct. at 1924; *Chandler*, 718 F.2d at 893. However, "[w]hen the card signer cannot read what is printed on the face of the card no presumption can be raised that the signer intended authorization for union representation in the absence of any other evidence than his signature." *Maximum Precision Metal Prods.*, 236 N.L.R.B. 1417, 1425 (1978). *But see NLRB v. American Art Indus.*, 415 F.2d 1223, 1229 (5th Cir.1969) (applying presumption of validity despite fact that employees did not understand English), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). It is for the party who seeks to invalidate a signed authorization card to show that the signer was incapable of reading the authorization card. *See El Rancho Market*, 235 N.L.R.B. 468, 474 (1978), *enforced mem.*, 603 F.2d 223 (9th Cir.1979). Where such a showing has been made, the Board will "consider[ ] evidence that somehow the message was translated or otherwise explained" in order to find the card valid. *Maximum Precision*, 236 N.L.R.B. at 1425; *see NLRB v. Security Plating Co.*, 356 F.2d 725, 726–27 (9th Cir.1966) (cards valid if meaning and import carefully and correctly explained in a language under-

---

**16.** Bakers also challenges the validity of authorization cards signed by Hung Phuong, Gia Phung, and Quang Thanh Nguyen. Respondent's Reply Brief at 11–12. However, we decline to consider these challenges, which are raised for the first time in reply. *See Sanchez v. City of Santa Ana*, 915 F.2d 424, 430 (9th Cir. 1990). We note that in its reply brief Bakers does not persist in challenging the validity of cards signed by Chi Van Hoang, Vinh Pham, Ton Quan, Minh Tran, Wilson Ton, or Luong Mach.

**17.** The name of Hang Nam appears as "Nam Hang" in the Board's Decision and Order. Similarly, the name of Ton Quan appears as "Quan Khong Ton," and the name of Minh Tran appears as "Tran Minh."

**18.** If eight of the challenged cards are valid, then those eight cards plus the seven cards found valid and relied upon by the Board but not challenged here will total fifteen valid authorization cards, a majority of the 28–employee bargaining unit.

stood by the non-English-speaking employee). The parties here dispute neither the clarity of the authorization cards signed by the Bakers employees, nor the scope of authority created by the cards. Instead, Bakers challenges the validity of certain cards on the ground that the employees who signed them were not sufficiently literate in English to understand the cards and, furthermore, that the significance of the cards was not adequately explained to these employees. We now review the evidence concerning the understanding of particular employees as to the meaning of the challenged authorization cards.

█ The Board contends that Nhon Nang La, for one, "could read some English and could understand most of the language on the card...." Petitioner's Brief at 15. Substantial evidence in the form of La's testimony supports this contention, *see* RT at 1335, 1356, and Bakers does not dispute it. Furthermore, because interpreters were used at the administrative hearing even when foreign-language-speaking witnesses could understand English, we agree with the Board's argument that the mere fact La testified in a language other than English, RT at 1315, does not in itself overcome the presumption that La understood the text of the authorization card. *Cf. 726 Seventeenth Inc.*, 235 N.L.R.B. 604, 608 (1978) (suggesting that the need for an interpreter vitiates presumption that employee understood authorization card). Accordingly, we find that substantial evidence supports the Board's implicit conclusion that the Company did not show La was not sufficiently literate to read and understand the card. Thus, Bakers did not dispel the presumption that La understood the card. We must therefore accept the Board's finding that La's card is valid.

As to Wilson Ton, the Board asserts that "there is no evidence properly in the record ... that he was incapable of understanding English." Petitioner's Brief at 17. Although Bakers points to a proffer of evidence that Wilson did not understand the card's text, the Company does not challenge the ALJ's decision excluding this evidence. Because we find no evidence in the record that fairly detracts from the Board's conclusion validating Ton's authorization card, we will not disturb the Board's finding. The same is also true as to the Board's finding that the cards signed by Minh Tran and Toha Dam were valid. Bakers points to no evidence in support of its contention that neither Tran nor Dam was capable of understanding the English text printed on the authorization card. Similarly, the Board was justified in validating Ton Quan's card on the basis that Bakers did not provide sufficient evidence to rebut the presumption that Quan understood the card.[19]

█ Regarding Chi Van Hoang, the Board concedes this employee was unable to read the English text printed on the authorization cards. To show that Hoang's card was valid, the Board asserts that there is substantial evidence indicating Hoang understood spoken English, and that the oral English explanation provided to him by David York, the Union representative, was sufficient to validate Hoang's card. We agree. Although Hoang admitted some spoken English was difficult for him to understand, the record as a whole supports the Board's implicit conclusion that Hoang could comprehend spoken English. Indeed, the portion of the transcript upon which Bakers relies to show Hoang's inability to understand English supports the contrary proposition:

> Counsel: Did you have any trouble understanding Mr. York?
>
> Hoang [with translator]: Yes there were some items that he had to repeat it [sic] many times, but he used simple English, so we also understood.

RT at 808. Additional testimony indicates that Hoang translated York's English remarks for non-English speaking employees at a meeting on September 25, 1983. *Id.* at

---

**19.** Although Bakers contends that Ton Quan understood "only easy words," Quan's admission to this effect was made in the context of discussing his ability as a translator. RT at 2354–56.

Bakers fails to show any proof that Quan had difficulty in understanding English well enough to read the text of the authorization card.

809. Thus, we conclude there was substantial evidence showing Hoang understood spoken English. Furthermore, York's statements to Hoang and other employees at the September 1983 meeting support the finding that the significance of the authorization card was sufficiently explained to Hoang.[20] Accordingly, we must abide by the Board's finding that Hoang's card was valid.

■■■■ The Board also relies on attendance of Vinh Pham and Hang Nam at the September 1983 meeting in order to validate their cards. The Board thus concedes neither Pham nor Nam was able to read the English text appearing on the cards. Both employees were present at the September 1983 meeting. RT at 809. As to Pham, Bakers contends only that this employee cannot read English, not that he does not understand the spoken language. In fact, there is substantial evidence that he does understand the latter. RT at 2063, 2157. Thus, Union Agent York's oral English explanation of the authorization card at the September 1983 meeting provided sufficient evidence on which the Board could base its validation of Pham's card. Furthermore, although Nam apparently understood only a little spoken English, RT at 2203–04, Chi Van Hoang and other Vietnamese translators were present at the September 1983 meeting and conveyed to those employees who had trouble understanding English York's explanation of the authorization cards. RT at 809, 2287–88. This constitutes substantial evidence in support of the Board's holding that Nam's card was valid.

Because we have found substantial evidence in support of the validity of eight of the ten challenged cards, we need not consider Bakers's challenges to the remaining cards of Trieu Tan Dao and Luong Mach. The seven unchallenged cards plus the eight we have reviewed here total fifteen valid authorizations cards. Substantial evidence thus exists for the Board's finding that a majority of the 28–employee bargaining unit supported collective bargaining on September 27, 1983.

### b. Statutory Supervisors

Bakers contends the Union lacked majority status because two employees, Michael Nguyen and Thanh Quan ("Fred") Phung, were supervisors within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11). In considering whether these two workers were statutory supervisors, the Board accepted Bakers's contentions that, if they were supervisors, it would be error to count their authorization cards and the cards they solicited in determining majority status. We too will accept these assumptions as correct. *See NLRB v. U.S. Postal Serv.*, 827 F.2d 548, 555 (9th Cir. 1987) (court of appeals may review only the rationale presented by Board). Because the Union's majority status depends in part on Nguyen's authorization card and other cards solicited by Nguyen and Phung, *see* 288 N.L.R.B. at 991 n. 4, the question whether Nguyen and Phung are statutory supervisors is pivotal.

■■■■ To determine whether a particular individual is a supervisor within the meaning of section 2(11) of the Act, the

---

**20.** The following testimony is illuminating:

Counsel: Did Mr. York describe to you how you would get those benefits?

Hoang: David and Tom told us that if the employees at the bakery wanted the Union to represent them, then they would talk to the employer in terms of contract.

. . . . .

Counsel: Mr. Hoang, what else did Mr. York say to you at the meeting?

Hoang: They explained to us that [sic] how to join the Union and how the Union can represent the employees[.]

Counsel: When he explained how to join the Union, what did Mr. York say, Mr. Hoang?

Hoang: He explained that if one person at the bakery wanted to join the Union, it's very hard with one person to join the Union. But, if we have a majority, a large number of employees, then we could sign [a] card to signify that we wanted to enter, join the Union.

RT at 810–11. The testimony continued:

Counsel: After Mr. York described to you how to get the Union in the bakery, did he pass out authorization cards?

Hoang: He gave us those cards, then he said if we can sign those cards, it would let the Union know how many people wanted the Union.

RT at 823.

Board must consider whether the individual may exercise "in the interest of the Employer" any of the powers enumerated in that section and, if so, whether the individual's exercise of such powers requires the use of independent judgment. *NLRB v. Chicago Metallic Corp.*, 794 F.2d 527, 530–31 (9th Cir.1986). The powers enumerated in section 2(11) include authority "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action. . . ." 29 U.S.C. § 152(11). Section 2(11) powers exercised in a manner that is "merely routine or clerical" are not sufficient to show supervisory status. *See Chicago Metallic*, 794 F.2d at 530–31; 29 U.S.C. § 152(11). The burden of proving supervisory status rests upon the party asserting it. *Soil Eng'g & Exploration Co.*, 269 N.L.R.B. 55, 55 (1984); *cf. McDonnell Douglas Corp. v. NLRB*, 655 F.2d 932, 936 (9th Cir.1981) (because a worker deemed to be a supervisor loses his or her organizational rights, the Board should not construe supervisory status too broadly), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

■ Bakers contends there is evidence that fairly detracts from the Board's conclusion that Nguyen and Phung were not statutory supervisors and, furthermore, that the record as a whole supports only the contrary conclusion. The Company points to testimony purportedly indicating that

> Phung and Nguyen both were actively involved in the hiring process . . ., approved absences and job changes . . ., signed and approved time cards . . ., reported to upper management on employee performance . . . [and] participated in the allocation of the Employer's bonus plan by submitting written evaluations of employees. . . .

Respondent's Opening Brief at 41. Furthermore, the Company contends that Nguyen and Phung "were involved in training, scheduling, arranging replacements and scheduling overtime". *Id.* The Board disputes these assertions, contending either that Nguyen and Phung could not exercise these powers, or that they could not exercise them with the requisite independent judgment.

### i. "Actively Involved in the Hiring Process"

The only evidence cited by Bakers that Nguyen hired workers is Nguyen's own testimony that he and Phung hired Xuan Duong. RT at 3858–60. Duong, however, testified that Bakers Vice President Gilles Wicker hired him. RT at 1383. The ALJ credited Duong rather than Nguyen. 288 N.L.R.B. at 1001, 1003. The Board adopted this credibility resolution, *id.* at 991 n. 2, and we see no reason to disregard it. Nguyen was not actively involved in the hiring process.

Much of the evidence to which Bakers points in support of Phung's involvement in hiring is only slightly probative. The testimony of Gia Tuong Phung that Fred Phung "got [him] a job at Bakers of Paris," RT at 1117; the testimony of Nhon Nang La that Phung "first told [him] when [he] should come to work at Bakers of Paris," RT at 1340; and the testimony of Cuong Luu that Phung was the only person to whom Luu spoke before starting work at Bakers, RT at 3474–75, shows little of Phung's involvement in hiring decisions at Bakers. Phung's own testimony that he usually consulted with Vice President Wicker before the Company hired someone for the department in which Phung worked provided substantial evidence for concluding Phung did not exercise independent judgment in the hiring process at Bakers. RT at 3963–65, 2994–98.[21]

---

21. Although Fred Phung testified to hiring his cousin Carlson without first consulting with Wicker, RT at 3995, this evidence does not significantly detract from the finding that Phung did not exercise independent judgment in the hiring process. Phung testified that he consulted with Wicker regarding hirings made both before and after the Company hired Phung's cousin. RT at 3994–95, 3997–98. Thus, the Board may well have discredited Phung's testimony about his role in hiring Carlson. *See* 288 N.L.R.B. at 991 n. 2, 1003.

### ii. "Approved Absences and Job Changes"

Although Bakers points to evidence indicating that employees would call in sick to either Nguyen or Phung, RT at 3480–82, 3848, no testimony indicates what power Nguyen or Phung could exercise regarding this information, or whether the exercise of any such power required independent judgment. At most, the evidence upon which the Company relies goes to whether employees perceived Nguyen and Phung as supervisors. Such evidence is secondary, and need be considered only in borderline cases. *See Chicago Metallic,* 794 F.2d at 531.

Furthermore, there is substantial evidence that neither Nguyen nor Phung used independent judgment in approving employee absences. When Xuan Duong wished to leave work early, Phung would allow it if there was not much work to do. When much work remained, Nguyen would have Duong ask Vice President Wicker for permission to leave early. RT at 1390–92. These decisions by Phung and Nguyen do not involve independent judgment. *See Hydro Conduit Corp.,* 254 N.L.R.B. 433, 439 (1981). Instead, they support an inference that Phung and Nguyen were not empowered to make independent judgments concerning employee absences. Duong's testimony that he asked Wicker rather than Phung or Nguyen for unpaid vacation bolsters this conclusion. RT at 1394.[22]

### iii. "Signed and Approved Time Cards"

As further proof of supervisory status, Bakers directs our attention to the parties' stipulation that Nguyen and Phung signed the time cards of numerous workers between August and September 1983. RT at 4009–12. The record discloses neither the significance of this act nor the degree to which independent judgment was required in its commission. Indeed, Phung testified that he merely added up the hours listed on the time cards and signed his name. RT at

4019. Nguyen's responsibilities apparently extended no further. *See* RT at 4422. Such tasks do not involve the independent judgment required of statutory supervisors.

### iv. "Reported to Upper Management on Employee Performance and Participated in the Allocation of the Employer's Bonus Plan by Submitting Written Evaluations of Employees"

The only evidence that Bakers raises in regard to whether Phung and Nguyen reported to upper management is two documents in which Phung and Nguyen rated the performances of certain employees. *See* RT at 3935–37, 3767–70. These evaluations were part of a bonus-determining process which its sole creator, Vice President Wicker, RT at 4644, described only as "very, very complicated." RT at 4638. When asked to explain this system, Wicker replied that it was "so complicated sometimes, that I was lost myself, and I cannot —now, it is impossible that I give you the way I did it [sic]." *Id.* Yet an explanation of the system was important in view of Wicker's admission that he would use his own judgment, at least in part, in making bonus decisions. RT at 4634–35, 4639. Without an explanation, it became impossible to assess Nguyen's and Phung's roles in the process. The ALJ thus referred to the process as "whimsical," and expressed skepticism whether the evaluations prepared by Phung and Nguyen had any influence on the bonus determinations. 288 N.L.R.B. at 1007. In view of Wicker's inability to explain the decision-making process that he devised, and his testimony that he reviewed and possibly revised the evaluations prepared by Phung and Nguyen, RT at 4419–20, there was substantial evidence allowing the Board to disregard the Company's claims that Phung and Nguyen meaningfully participated in determining bonuses. The forms completed by these two workers do not represent exercise of a supervisory power, nor do they indicate the

---

**22.** Regarding job changes, Bakers fails to refer to any evidence indicating that Phung or Nguyen could change the jobs of employees. Their ability to arrange employees' work schedules is discussed hereinafter.

potential to exercise such power. *See George C. Foss Co. v. NLRB*, 752 F.2d 1407, 1410–11 (9th Cir.1985); *Ahrens Aircraft Inc.*, 259 ·N.L.R.B. 839, 843 (1981), *enforced*, 703 F.2d 23 (1st Cir.1983).

v. "Involved in Training, Scheduling, Arranging Replacements and Scheduling Overtime"

Finally, in support of its argument that Phung and Nguyen were statutory supervisors, Bakers cites to testimony by various workers that Michael Nguyen and Fred Phung either told them their schedules or told them what to do. RT at 1123 (Gia Tuong Phung), 1340–41 (Nhon Nang La), 1387 (Xuan Duong), 3475–77 (Cuong Luu). To the extent that this testimony indicates that Phung and Nguyen arranged workers' schedules, there is also evidence indicating that Phung and Nguyen did nothing more than staff positions within a set schedule according to the availability of workers. RT at 3865–68. In other words, rather than requiring employees to accommodate a schedule established by Phung or Nguyen, these two workers would ask their fellow employees whether they were available to staff established positions. There is no evidence that Phung and Nguyen had the authority to require an employee's attendance at a particular time. Their scheduling activity is thus more clerical than supervisory. *See NLRB v. St. Francis Hosp.*, 601 F.2d 404, 421 (9th Cir.1979).

To the extent that the testimony upon which Bakers relies here shows that Phung and Nguyen trained employees, there is also evidence that their assistance was only that of experienced coworkers helping newcomers perform an easily learned duty with which all were charged. RT at 1385–88. None of the testimony to which Bakers refers supports the Company's assertion that Phung and Nguyen were involved in arranging replacements.

Lastly, Bakers cites Cuong Luu's testimony that in late 1983 Phung and Nguyen would ask him to work extra hours. RT at 3484. While Luu did so testify, this fact need not have compelled the Board to find Nguyen and Phung to be statutory supervisors. Nguyen elaborated on the circumstances under which overtime would be required:

Q Mr. Nguyen, you said that you sometimes asked employees to work during the weekend, overtime?

A Yes, sometime [sic].

Q Which employees did you ask to work overtime in the month of September 1983?

A I cannot remember all the names that had been worked [sic] during the weekend.

Q Can you remember any name?

A Practically all of the people in that list worked during the weekend.

Q Are you saying that when people would work extra hours on the weekend, the whole shift would work extra hours, whoever happened to be working that night?

A Usually if a shift from ten o'clock [sic], they start working then and they see there is a lot of work to be completed, they automatically stay behind and try to complete the work.

Q So all the packagers would automatically stay behind, everybody who happened to be there that night; is that right?

A That's correct.

RT at 3853. Under these circumstances, the Board would be justified in concluding that there was insufficient evidence to show that Nguyen or Phung possessed the authority to require a particular worker to work overtime.

Much of the time, Nguyen and Phung performed either the same duties as those who they purportedly supervised or related menial tasks. RT at 1331, 3510, 3828–29. Although we acknowledge the particular responsibilities with which Bakers charged Michael Nguyen and Fred Phung, we conclude that there was substantial evidence supporting the Board's decision that these two workers were not supervisors within the meaning of section 2(11) of the Act. Accordingly, the Board properly counted the authorization card signed by Nguyen, and those cards solicited by Nguyen and Phung, in determining whether the Union

held majority status on September 27, 1983. Substantial evidence exists for the Board's finding of majority status.

### 2. Changed Circumstances

Bakers also challenges the bargaining order on the ground that the Board did not sufficiently consider the change in circumstances between the dates of the unfair labor practices with which this case is concerned and the date the Board issued its bargaining order. Specifically, the Company contends the Board's decision did not adequately take into account the turnover of employees in the bargaining unit and the passage of time.

 Ordinarily, we will not remand a case solely to have the Board consider further the appropriateness of a bargaining order in light of the passage of time and employee turnover. *See Seattle–First Nat. Bank v. NLRB*, 892 F.2d 792, 795 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990); *L'Eggs Prods., Inc. v. NLRB*, 619 F.2d 1337, 1352–53 (9th Cir.1980). *But cf. NLRB v. Western Drug*, 600 F.2d 1324, 1326 & n. 5 (9th Cir.1979) (holding that Board must consider events occurring before ALJ hears unfair labor practice charges).[23] Thus, such changes have been held irrelevant to the adjudication of enforcement proceedings. *NLRB v. Buckley Broadcasting Corp.*, 891 F.2d 230, 234–35 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). *But see Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 404–06 (5th Cir.1991). These rules prevent employers from intentionally prolonging Board proceedings in order to frustrate the issuance of bargaining orders. *Seattle–First*, 892 F.2d at 795; *Buckley*, 891 F.2d

at 235. Although this policy may disenfranchise employees, it has been adhered to even when the majority upon which a bargaining order is founded has been determined not by election but by authorization cards. *See L'Eggs*, 619 F.2d at 1353; *NLRB v. Pacific Southwest Airlines*, 550 F.2d 1148, 1152–53 (9th Cir.1977); *NLRB v. L.B. Foster Co.*, 418 F.2d 1, 4–5 (9th Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). Accordingly, we will not consider Bakers's arguments concerning employee turnover and the passage of time. Our decision is in keeping with this circuit's "wall" of authority upholding the policy of deterring employers' delay tactics. *See Seattle–First*, 892 F.2d at 795. Furthermore, we perceive no injustice in applying this rule here.[24]

### CONCLUSION

The procedures employed by the Board in this case do not prevent enforcement of the Board's order. Furthermore, the bargaining order reflects a correct application of the law, insofar as we are called upon to review it and is supported by substantial evidence. Accordingly, the Board's petition for enforcement is GRANTED; the order reported at 288 N.L.R.B. 991 (1988) is ENFORCED.

---

**23.** Bakers does not complain that the ALJ failed to consider either employee turnover or passage of time. Instead, the Company faults the Board in not considering these factors when deciding whether to adopt the ALJ's decision and recommended order.

**24.** From our review of the record, it appears that Bakers failed to move the Board to reopen the case for the purpose of receiving the Company's evidence of employee turnover. *See Amazing Stores, Inc. v. NLRB*, 887 F.2d 328, 330 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110

S.Ct. 1477, 108 L.Ed.2d 614 (1990); 29 C.F.R. § 102.48(b). Thus, the Board struck from Bakers's brief Wicker's averment as to employee turnover. 288 N.L.R.B. at 993 n. 16. The Board may have been justified in doing so. *See* 29 C.F.R. §§ 102.45(b), .46(a), .46(c). However, Bakers does not seek review of this decision. Instead, Bakers simply attaches Wicker's statement to its opening brief before this court. We cannot consider it. *See Seattle–First*, 892 F.2d at 795; 29 U.S.C. § 160(e).