## McDONNELL DOUGLAS CORPORATION, Appellant,

v.

## NATIONAL LABOR RELATIONS BOARD, Appellee,

and

**Robert H. Mourning, Intervenor.**

**No. 79–7541.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1980.

Decided March 12, 1981.

Rehearing and Rehearing En Banc Nov. 12, 1981.

---

James Adler, Munger, Tolles & Ricker-shauser, Los Angeles, Cal., argued, for appellant.

Elliott Moore, N. L. R. B., Washington, D. C., on brief; Gary Green, Director, Legal Dept., Washington, D. C., for appellee.

Before SCHROEDER and CANBY, Circuit Judges and PFAELZER, District Judge.*

CANBY, Circuit Judge.

The National Labor Relations Board found that McDonnell Douglas had committed unfair labor practices in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), by firing Robert Mourning for union activity and by warning Malcolm Campbell not to become involved in union activity. McDonnell Douglas petitioned this court for review under § 10(f) of the Act, 29 U.S.C. § 160(f). The Board cross-petitioned for enforcement of its order to cease the unfair labor practices and to reinstate Mourning with back pay. Mourning intervened in support of the Board. We enforce the Board's order.

I.

McDonnell Douglas employed five transport pilots, including Mourning and Campbell, to ferry company executives and other persons between company facilities in southern California. The transport pilots also flew "chase" missions, photo missions, test flights, and instruction flights for new company pilots. Usually, the transport pilots flew alone, but some flights required a copilot. The transport pilots therefore alternated as pilots in command and copilots; their job required that they serve in each position at different times. Mourning usually flew as pilot in command. On approximately five percent of his flights as pilot in command, he had a copilot. Otherwise, he flew without a crew. On another five percent of his flights, he was accompanied by a pilot trainee. Occasionally, he was accompanied by a photographer or observer.

Mourning became interested in organizing a pilots' union in late 1967. He talked to his fellow pilots about organizing, and mailed them literature from the Airline Pilots Association. He also talked about the union to his supervisor, Orion Quinn. He approached company officials to talk about working conditions. At a meeting in mid-1968, A. G. Heimerdinger, director of flight operations, told Mourning that if he did not like the way the company was being run, he should leave. In May 1968, Heimerdinger sent a memo to the company president to advise him that the pilots were organizing. In June 1968, another memo written by the company's assistant supervisor of labor relations identified Mourning as one of three pilots behind the union movement.

Mourning was fired on November 15, 1968. Heimerdinger told him that he was fired because he had blown out two vacuum pumps during a flight on the preceding September 30. Heimerdinger said the incident was "a matter of misoperation of the aircraft which involved safety considerations." During the September 30, flight, two vacuum pumps had failed. Mourning was pilot in command of the plane but a copilot had actually operated the controls. Mourning reported the failure to company mechanics, and the vacuum pumps were replaced. The mechanics also found scorched paint on the engine cowling, suggesting overheating. Heimerdinger ordered a complete inspection of the plane, but no other damage was found. Mourning was not reprimanded at that time.

After Mourning's discharge, Quinn told Campbell not to get involved in the "politics" that was stirring up the pilots. Quinn said that if Campbell just did his job and avoided the "malcontents", he would be better off in the long run. Quinn told Campbell that the order to fire Mourning had come "from the top," and that if Mourning had not been so open about the union, he

* The Honorable Mariana R. Pfaelzer, United States District Judge, Central District of California, sitting by designation.

would not have been fired. Within 30 days of Mourning's discharge, Campbell blew out vacuum pumps on two separate planes, but he was not discharged. On other occasions, pilots blew out tires during landing, flew planes into power lines, and ran planes into fixed objects on the ground, but none of the pilots was fired as a result.

Mourning filed an unfair labor practice charge against McDonnell Douglas. An administrative law judge found that Mourning and Campbell were supervisors who were not protected by the Act. The Board affirmed the ALJ's decision and dismissed the complaint. 221 N.L.R.B. 1180 (1975). On appeal, the D.C. Circuit remanded to the Board to consider whether Mourning's crew ever consisted of persons who were "employees" within § 2(3) of the Act or were merely pilots of equal rank. *Mourning v. NLRB*, 559 F.2d 768 (D.C.Cir.1977). On remand, the Board decided that Mourning and Campbell were not supervisors because they exercised authority only over other pilots like themselves, and that in any event the exercise of this authority was too sporadic and routine to make them supervisors. The Board then found that McDonnell Douglas had used the vacuum pump incident as a pretext to fire Mourning, and that his discharge was really intended to discourage union activity. It therefore found that McDonnell Douglas violated §§ 8(a)(1) and 8(a)(3) by firing Mourning. The Board also found that Quinn's comments to Campbell were a warning not to engage in union activity and therefore violated § 8(a)(1).

## II.

The initial issue in this case may be simply stated: Are Mourning and Campbell supervisors? If they are, then they are not entitled to the protections of § 7 of the National Labor Relations Act, and the employer, McDonnell Douglas, may fire Mourning for any reason or for no reason. *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1382 (9th Cir. 1976). The evidence focused on Mourning's status. The Board found that Mourning was not a supervisor. We must accept that decision if it is supported

by the record and has a reasonable basis in law. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); *Laborers & Hod Carriers, Local No. 341 v. NLRB*, 564 F.2d 834, 837 (9th Cir. 1977).

The definition of supervisor is found in § 2(11) of the Act, 29 U.S.C. § 152(11):

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

A worker who uses independent judgment to exercise any one of the listed powers in the interest of the employer is a supervisor. *Walla Walla Union–Bulletin v. NLRB*, 631 F.2d 609, 613 (9th Cir. 1980); *Arizona Public Service Co. v. NLRB*, 453 F.2d 228, 230 (9th Cir. 1971); *NLRB v. Fullerton Publishing Co.*, 283 F.2d 545, 548 (9th Cir. 1960). For our purposes, a supervisor is one who uses independent judgment responsibly to direct other employees in the interest of the employer.

The definition of "supervisor" in § 2(11) depends upon the meaning of "other employees." McDonnell Douglas argues that "other employees" should be given its everyday meaning, i. e., other persons who work for the employer. Such a definition would include the copilots who flew with Mourning when he was pilot in command. That would make Mourning a supervisor, since to some extent he directed his copilots when he was pilot in command.

The NLRB, however, accepted the invitation of the District of Columbia Circuit and held that "employees" in section 2(11) must be defined as provided in § 2(3), 29 U.S.C. § 152(3). That definition states:

§ 2. Definitions.

When used in this subchapter—

\*    \*    \*    \*    \*    \*

(3) The term "employee" shall include any employee . . . but shall not include . . . any individual employed as a supervisor. . . .

With this definition in effect, it cannot sensibly be maintained that Mourning is a supervisor by reason of his authority over his fellow pilots. The reason for that conclusion is that if Mourning is a supervisor, then so must his copilots be supervisors. Mourning and his fellow pilots serve interchangeably as pilots in command and copilots. If they are all supervisors, they cannot be "employees" by reason of § 2(3). That would mean that the pilots would be supervisors with no employees to supervise. Yet § 2(11) defines "supervisor" as one who exercises authority over "employees." Defining the pilots as "supervisors" therefore becomes a logical impossibility under the Act. The escape from this logical dilemma is to hold, as the Board did, that in their relation to each other, the pilots are employees and not supervisors.

We agree with the Board's conclusion that "employees" as used in § 2(11) must be defined in accordance with § 2(3). In addition to the logical difficulties attending the contrary approach, there are several reasons why we believe the Board was correct and McDonnell Douglas wrong. The first arises from the plain words of § 2. All of the definitions, including that of "employee", apply to the terms "when used in this subchapter." Section 2(11) is not only in the same subchapter, it is in the very same definitional section containing § 2(3). It seems highly likely that Congress, in constructing this definitional section, would intend that the defined terms interrelate.[1]

It is true that the § 2(3) definition of "employees" was held not to limit the power of the Board under § 10(c) to order "such affirmative action including reinstatement of employees . . ., as will effectuate the policy of this Act." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). In that case, however, the Court found that the broad purposes of § 10(c) militated in favor of permitting the Board to reinstate strikers who had found equivalent employment even though they would be excluded from the definition of "employee" provided by § 2(3). No such policy reasons exist in the present case to overcome the usual presumption that the plain words of § 2 mean what they say.

Indeed, the policies underlying the Act militate in favor of applying the definition of § 2(3) in the present case. It is important for the Board not to construe supervisory status too broadly, for a worker who is deemed to be a supervisor loses his organizational rights. *Westinghouse Electric Corp. v. NLRB*, 424 F.2d 1151, 1158 (7th Cir.) *cert. denied*, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970). The purpose of excluding supervisors from the protection granted by the Act to employees is that the status of the two groups in relation to each other is fundamentally inconsistent. Supervisors are not included in the bargaining unit of employees because their supervisory function would create conflicts of interest in dealing with employees in the unit. H.R. Rep.No. 245, 80th Cong., 1st Sess. 14 (1947). No such representational conflict occurs when one pilot deals with another pilot whose relationship to management is exactly the same as his own. In this case, Mourning and the other pilots were equals, each of whom had the job of serving interchangeably as pilot in command and as co-pilot. As equals, they all had to be regard-

---

1. As stated in the text, § 2(11) refers to supervisory authority over "other employees." Our conclusion that "employees" is defined by § 2(3) does not render the word "other" superfluous; its import, however imperfectly stated, is to require that the supervisory authority be exercised over other employees of the *same* employer. *Mourning v. NLRB*, 559 F.2d 768, 770 n.3 (D.C.Cir.1977); *Illinois State Journal-Register, Inc. v. NLRB*, 412 F.2d 37, 43–44 (7th Cir. 1969).

We reject the argument of McDonnell Douglas that the Board's ruling would render a company president who supervised only supervisors an "employee" within the meaning of the Act. To qualify as a supervisor, it is only necessary that a person supervise statutory "employees" directly or indirectly through a chain of command.

ed as supervisors or all as employees. If supervisors, they were excluded from the benefits of the Act, even though there was no representational conflict to justify the exclusion. The Board chose the better alternative of treating them all as employees and bringing them within the protection of the Act.

■ McDonnell Douglas argues that this result is contrary to a trilogy of the Board's prior decisions. In *Douglas Aircraft Co.*, 207 N.L.R.B. 682 (1973), *McDonnell Aircraft Co.*, 207 N.L.R.B. 684 (1973), and *Lockheed-California Co.*, 207 N.L.R.B. 686 (1973), the Board held that pilots in command who flew regularly with non-pilot crews were supervisors. Our review of the record substantiates the Board's finding that Mourning did not exercise supervisory authority over non-pilot crew members. Consequently, we do not see an inconsistency between the result in this case and the Board's decisions in the trilogy.

This case is different from the trilogy in three respects. First, Mourning did not fly regularly with non-pilot crews when he was pilot in command. He had a copilot on five percent of his flights. Otherwise, he flew without a crew. McDonnell Douglas argues that Mourning was accompanied by a pilot trainee on five percent of his flights. The Board has consistently held, however, that an instructor-trainee relationship is different from a supervisor-employee relationship. *See Rub-R Engraving Co.*, 89 N.L.R.B. 475 (1950); *Petroleum Helicopters, Inc.*, 184 N.L.R.B. 60 (1970); *Ball Plastics Division*, 228 N.L.R.B. 633 (1977). McDonnell Douglas also argues that Mourning flew with photographers and observers. The record does show that Mourning occasionally carried a photographer or observer on his flights. The Board found, however, that these employees were mere passengers, not members of Mourning's crew. Authority exercised by a pilot over passengers is not supervisory authority. *Mourning v. NLRB*, 559 F.2d at 771 n.4.

Second, Mourning did not exercise the same type of authority over his copilots as the trilogy pilots did over their crew members. In the trilogy, the pilots exercised supervisory authority in the true sense of the word. The pilots assigned duties to crew members, and on overnight flights decided when the crew worked and when they took time off. In this case, however, Mourning's authority stemmed from his professional expertise. He exercised only the authority needed to insure the safety of the airplane, passengers, and crew. Such authority is an intrinsic part of any pilot's job. Taken alone, it does not necessarily prove that Mourning is a supervisor. *See Kaiser Engineers v. NLRB*, 538 F.2d at 1384; *NLRB v. Doctors' Hospital*, 489 F.2d 772, 776 (9th Cir. 1973).

Finally, the Board held that even if Mourning's authority over his copilots were supervisory in nature, it was too sporadic to permit a finding that he was a supervisor within the meaning of the Act. We believe that substantial evidence in the record supports that ruling. Mourning flew with a copilot only about 5% of his overall flight time. Such an infrequent exercise of supervisory authority may reasonably be viewed as insufficient to render § 2(11) applicable. *Plastic Workers Union v. NLRB*, 369 F.2d 226, 230 (7th Cir. 1966); *see NLRB v. Lindsay Newspapers, Inc.*, 315 F.2d 709, 712 (5th Cir. 1963). This is particularly true when the occasional direction is exercised over fellow workers of equal rank. *NLRB v. Doctors' Hospital*, 489 F.2d at 776; *see NLRB v. Security Guard Services, Inc.*, 384 F.2d 143 (5th Cir. 1967). Consequently, we do not believe that adherence to the trilogy dictates a decision in favor of McDonnell Douglas in this case.

### III.

Once the Board decided that Mourning and Campbell were not supervisors, it faced the question whether McDonnell Douglas had committed the alleged unfair labor practices. We agree that McDonnell Douglas's actions in this case violated §§ 8(a)(1) and 8(a)(3) of the Act.

■ The Board found that McDonnell Douglas had fired Mourning because of his

union activity. Specifically, the Board found that the vacuum pump incident was merely a pretext for his discharge. We agree. Heimerdinger said that he discharged Mourning because the vacuum pump incident demonstrated his inattention to safety considerations. Yet Mourning was regarded as a competent pilot by his fellow pilots and by Quinn, his immediate superior. Heimerdinger did not reprimand Mourning immediately after the incident. In fact, Heimerdinger granted Mourning a merit increase in pay after the incident occurred. Other pilots who were guilty of the same or worse conduct were not fired. We think the Board was clearly justified in concluding that Heimerdinger seized upon the vacuum pump incident to rid himself of Mourning. McDonnell Douglas officials were concerned about union activity among the pilots. Mourning had been identified as one of three pilots behind the union movement. Quinn even told Campbell that Mourning would not have been fired if he had not been so open about his union activities. The Board could not avoid the conclusion that Mourning's union activity was the "moving cause" behind his discharge. *Stephenson v. NLRB*, 614 F.2d 1210, 1213 (9th Cir. 1980).

■ McDonnell Douglas argues that it was improper for the Board to make this finding without remanding to the ALJ for credibility findings. We disagree. First, McDonnell Douglas never clearly asked the Board for this relief. In any event, the Board did not act improperly. Contrary to McDonnell Douglas' contention, the Board did not proceed on the erroneous assumption that there was no contradiction in testimony over the ultimate question of anti-union animus. Instead, the Board found sufficient facts established by uncontradicted testimony to permit it readily to conclude that Mourning was discharged for his union activity, and to reject as pretextual the explanations offered by company officials. There was no need in this instance to remand for credibility findings; the Board was free to draw its own inferences from the record. *NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1347 (9th Cir.

1978); *see Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir. 1977). Its opinion clearly sets forth the inferences it drew and the substantial evidentiary bases for them.

■ The Board also interpreted Quinn's comments to Campbell as a warning not to engage in union activity. That finding was similarly within the power of the Board and was supported by substantial evidence. We will therefore not set it aside. *NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45, 48 (9th Cir. 1970).

We conclude that the Board committed no error and that substantial evidence on the record as a whole supports its findings that McDonnell Douglas' actions violated §§ 8(a)(1) and (3) of the Act. The petition to review and set aside the Board's order is denied, and enforcement of the Board's order is granted.