28 F.3d 107
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CHEVRON, U.S.A., INC., Respondent.
 No. 92-70844.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 17, 1994.
Decided June 23, 1994.
 
 Before: D.W. NELSON, BOOCHEVER, and BEEZER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Pursuant to Sec. 10(e) of the National Labor Relations Act ("Act"), 29 U.S.C. Sec. 160(e), the National Labor Relations Board ("Board") has applied to this court seeking enforcement of its order that Chevron U.S.A., Inc. ("Company") recognize and bargain collectively with the Sailor's Union of the Pacific, AFL-CIO ("Union") as the exclusive representative of the captains of the Company's tugboats operating in San Francisco Bay and its tributaries. The Company argues that it should not be required to bargain with the captains because they are "supervisors" within the meaning of Sec. 2(11) of the Act, 29 U.S.C. Sec. 152(11). We have jurisdiction under 29 U.S.C. Sec. 160(e). We enforce the Board's order.
 
 
 3
 * The Company argues initially that the Board erred in holding that its collective bargaining agreement with the Union included the captains of the Chevron Richmond. It contends that it reached no agreement with any union to represent the Chevron Richmond's captains. The Company argues that the Board incorrectly included these captains in a bargaining unit with the Standard No. 4 captains.
 
 
 4
 We will uphold a decision of the Board if supported by substantial evidence in the record as a whole. NLRB v. Bakers of Paris, Inc., 929 F.2d 1427, 1441 (9th Cir.1991). The Board's credibility determinations are not overturned "unless shown to be incorrect by a clear preponderance of the evidence." NLRB v. World Evangelism, Inc., 656 F.2d 1349, 1353 (9th Cir.1981). The Board "has 'extremely broad' discretion in deciding a question of accretion of employees to an existing bargaining unit," and we will not disturb its judgment absent an abuse of discretion. International Ass'n of Machinists and Aerospace Workers, AFL-CIO, 759 F.2d 1477, 1479 (9th Cir.1985). The Board's designation of an appropriate bargaining unit also will not be overturned unless "clearly inappropriate." NLRB v. Retail Clerks Local 588, Retail Clerks Int'l Ass'n, AFL-CIO, 587 F.2d 984, 987 (9th Cir.1978).
 
 
 5
 The Board gave great weight to the testimony of the Union's president, who stated that he represented all the captains employed by the Company for its San Francisco Bay tugs. The Board also considered that the collective bargaining agreement in force until November 30, 1990 between the Union and the Company, which the Company claimed applied only to Standard No. 4 captains, in fact referred to all "Launch Captains employed on Inland Vessels operating in San Francisco Bay and tributaries." Based on these considerations, the Board concluded that the Union was the exclusive representative of the captains of both the Standard No. 4 and the Chevron Richmond and that the captains constituted an appropriate bargaining unit.
 
 
 6
 Substantial evidence supports the Board's conclusion. The Company failed to show by a clear preponderance that the Board incorrectly found the Union's president to be credible. The collective bargaining agreement's reference to more than one vessel, moreover, supports the Union's position that it represents the captains of both tugboats. This conclusion is logically supported by the fact that some captains are employed on both tugs. The Board did not abuse its discretion in designating as an appropriate bargaining unit the six captains employed by the Company on its San Francisco Bay tugboats.
 
 
 7
 The Company argues that the Board erred in concluding that the tugboat captains are not supervisors within the meaning of the Act. A "supervisor" is defined in Sec. 2(11) as:
 
 
 8
 [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 9
 29 U.S.C. Sec. 152(11).
 
 
 10
 The Board's determination as to whether a person is a supervisor is a question of fact that is conclusive if supported by substantial evidence in the record as a whole. NLRB v. Dick Seidler Enters., 666 F.2d 383, 385 (9th Cir.1982). "Evidence is substantial when reasonable minds might accept it as adequate to support a conclusion, even if reasonable minds might also draw a second, inconsistent conclusion from the same evidence." Bakers of Paris, 929 F.2d at 1441. In considering the record as a whole, we take into account "whatever evidence in the record fairly detracts from the weight of the evidence relied on by the Board." Id. The burden is on the Company to prove that the Board incorrectly ruled that the tugboat captains were not supervisors under the Act. See Walla Walla Union-Bulletin v. NLRB, 631 F.2d 609, 613 (9th Cir.1980).
 
 
 11
 We grant deference to the Board's interpretation of the Act, which "must be upheld if reasonably defensible." World Evangelism, Inc., 656 F.2d at 1353. Judicial deference to the Board's expertise in distinguishing between employees and supervisors is particularly strong because "distinctions must be drawn between gradations of authority 'so infinite and subtle that of necessity a large measure of informed discretion is involved.' " Walla Walla Union-Bulletin, 631 F.2d at 613 (quoting NLRB v. Adrian Belt Co., 578 F.2d 1304, 1311 (9th Cir.1978)). The Board's findings are nevertheless subject to judicial review. Id. at 612.
 
 
 12
 The Company makes several arguments in support of its contention that the captains are supervisors. It concedes that the captains lack express authority to hire, transfer, suspend, lay off, recall, promote, or discharge employees. The Company contends, however, that the captains effectively recommend transfers, promotions, rewards and discipline of the deckhands and utilitymen, who, with the captain, comprise the three-person crew. Such recommendations occur through the evaluation forms the captains complete regarding the work performances of the deckhands and utilitymen. The Company also argues that the captains assign and direct crew members by ordering them during dangerous situations, ensuring they comply with safety standards, and directing them to perform maintenance tasks. The Company further urges that we infer that the captains are supervisors from the fact that the Company would not leave its tugboats unsupervised during their long, continuous hours of operation.[1]
 
 
 13
 The Board found that although the tugboat captains have some supervisory authority, they rarely direct the crew members. Most of the time, the Board found, the crew performs its work functions without any assignment, direction or instruction by the captains. In addition, the safety matters addressed by the captains do not require use of independent judgment but are dictated by an established safety policy.
 
 
 14
 The Board concluded that the captains do not effectively recommend transfers, promotion, rewards or discipline of crew members. The Board found no evidence that the Company relied upon the captains' evaluations and recommendations in making personnel decisions. Instead, the responsibilities for assigning crew members to the tugboats, assigning replacements if crew members are absent, scheduling the crews' vacation and approving personal time off from work rest with the Company's shore-based supervisors.
 
 
 15
 The Board is in the best position to determine, based on the facts of each case, whether an employee is a supervisor under the Act. See Walla Walla Union-Bulletin, 631 F.2d at 613. After considering the record as a whole, we conclude that reasonable minds could accept the Board's conclusion that the Company's captains are not supervisors. The Board's decision is supported by substantial evidence and is "reasonably defensible." Additionally, we are reluctant to interpret the term "supervisor" too broadly because "a worker who is deemed to be a supervisor loses his organizational rights." McDonnell Douglas Corp. v. NLRB, 655 F.2d 932, 936 (9th Cir.1981), cert. denied, 455 U.S. 1017 (1982). We defer to the Board's decision and enforce its order.
 
 
 16
 ENFORCED.
 
 BOOCHEVER, Circuit Judge, dissenting:
 
 17
 I dissent because I believe the tugboat captains had the power to use their independent judgment responsibly to direct the crew members, and are therefore supervisors.
 
 
 18
 A supervisor is defined in Section 2(11) of the National Labor Relations Act, 29 U.S.C. Sec. 152(11) (1988), as:
 
 
 19
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 20
 If the existence of any one of the enumerated powers is established, and if it is exercised with the use of independent judgment, that is sufficient to confer supervisory status no matter how seldom or how often the power is exercised. George C. Foss Co. v. NLRB, 752 F.2d 1407, 1410 (9th Cir.1985); Walla Walla Union-Bulletin, Inc. v. NLRB, 631 F.2d 609, 613 (9th Cir.1980).
 
 
 21
 We of course are reviewing a decision of the National Labor Relations Board. Generally, the Board's determination of whether an employee is a supervisor is considered a question of fact and must be affirmed if supported by substantial evidence in the record as a whole. NLRB v. Dick Seidler Enters., 666 F.2d 383, 385 (9th Cir.1982). The court is required to review the entire record, however, including the evidence that detracts from the Board's decision, even though the evidence supporting the Board's conclusion, viewed by itself, might be substantial. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); NLRB v. Bakers of Paris, Inc., 929 F.2d 1427, 1441 (9th Cir.1991). Moreover, because the Board's decisions applying this statute are notoriously inconsistent, the Board's decision in this case is entitled to less deference. See Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir.1992) (citing three circuits and a commentator recommending closer scrutiny of NLRB determinations of supervisory status, because decisions are inconsistent); Children's Habilitation Center, Inc., v. NLRB, 887 F.2d 130, 132 (9th Cir.1989) (NLRB's "well-attested manipulativeness in the interpretation of the statutory test for 'supervisor' " affects deference of judicial review).
 
 
 22
 Our review should be even more exacting where the Board's opinion is against the clear direction of case law. As pointed out by Chevron, ship captains and other officers are supervisors in a great number of decisions. See, e.g., Hanna Mining Co. v. District 2, Marine Eng'rs Beneficial Ass'n, 382 U.S. 181, 184, 188, 190 (1965) (marine engineers); Maritime Overseas Corp. v. NLRB, 955 F.2d 212, 217 (4th Cir.1992) (second and third mates exercised supervisory authority); Jensen v. Farrell Lines, Inc., 625 F.2d 379, 381 n. 1 (2d Cir.1980) (licensed deck officers and engineers), cert. denied, 450 U.S. 916 (1981); International Org. of Masters v. NLRB, 575 F.2d 896, 904 (D.C.Cir.1978) (licensed deck officers); International Org. of Masters, Marine Div. v. NLRB, 539 F.2d 554, 558-59 (5th Cir.1976) (licensed deck officers), cert. denied, 434 U.S. 828 (1977); International Org. of Masters, Int'l Marine Div. v. NLRB, 486 F.2d 1271, 1273-74 (D.C.Cir.1973) (per curiam (masters and mates), cert. denied, 416 U.S. 956 (1974); Local 28, Int'l Org. of Masters v. NLRB, 321 F.2d 376, 378 (D.C.Cir.1963) (masters, pilots, and mates); National Marine Eng'rs Beneficial Ass'n v. NLRB, 274 F.2d 167, 170, 172 (2d Cir.1960) (towboat pilots, masters, and mates); Aiello v. Apex Marine Corp., 610 F.Supp. 1255, 1263 (E.D.Pa.1985) (engineers); Sun Refining & Mktg. Co., 301 N.L.R.B. 642, 650 (1991) (second and third mates, first, second, and third assistant engineers); District No. 1, Pac. Coast Marine Eng'rs' Beneficial Ass'n, 287 N.L.R.B. 628, 633, 642 (1987) (licensed engineers).
 
 
 23
 Still more of the NLRB's cases finding that captains and other boat personnel working under captains were supervisors are very close to our facts. See, e.g., Universal Towing Co., 198 N.L.R.B. 1124, 1126 (1972) (barge operators receiving radio instructions and working three-day shifts, who see that crew perform their jobs, inspect the crew's work and give necessary orders, are supervisors); A.L. Mechling Barge Lines, Inc., 197 N.L.R.B. 592, 595 (1972) (towboat "masters" (captains) closely supervised by shore personnel through regular radio contact "responsibly direct" crew members and are supervisors), overruled on other grounds, Power Piping Co., 291 N.L.R.B. 494 (1988); Mon River Towing, Inc., 173 N.L.R.B. 1452, 1454-55 (1969) (boat captains under regular direction from port are supervisors because they are responsible for boat safety, crew and cargo while underway; keep log of crewmembers; put crewmembers off boats while underway; make work assignments; evaluate crewmembers' ability; and pass on leave requests), enforced, 421 F.2d 1 (3d Cir.1969); Berhardt Bros. Tugboat Serv., Inc., 142 N.L.R.B. 851, 853-54 (1963) (tugboat pilots who, while on watch, judge weather conditions to place lookout, order crew in connection with tow, lookout, and amount of power, "responsibly direct" employees), enforced, 328 F.2d 757 (7th Cir.1964); Local 28, Int'l Org. of Masters, Inc., 136 N.L.R.B. 1175, 1203-04 (1962) (tugboat masters, mates, and pilots who make "swift on-the-spot judgments" in unpredictable weather are supervisors because of "direct concern ... with the conduct of subordinates to effect a safe and efficient locking or docking or to prevent a catastrophe in an emergency"), enforced, 321 F.2d at 376; Madril, Inc., 119 N.L.R.B. 1174, 1181 (1957) (bargemasters and ship captains who maintain vessels in seaworthy condition, maintain general safety of crew, issue orders while at sea, assign men to watches, and decide if weather conditions are safe are supervisors). See also Moran Towing of Maryland, Inc., Case No. 5-CA-19267, pp. 48, 50-53 (N.L.R.B. May 29, 1990) (unpub.) (captains in overall charge of tugboats who are responsible for safe navigation, judge when weather is too rough to attempt job, resulting in overtime, "direct" and are supervisors even though crews are experienced and work routine); Knappton Corp., Case No. 36-UC-116, pp. 4-10 (N.L.R.B. Nov. 17, 1983) (unpub.) (captains in regular radio contact with dispatchers and directed by pilots, who are responsible for safety of boat and crew, reprimand employees regarding safety, decide boat's course, and change work sequence are supervisors); Pacific Towboat & Salvage Co., Case No. 21-RC-17210, pp. 7-9 (N.L.R.B. Oct. 6, 1983) (unpub.) (tugboat masters who see that crew performs jobs, inspect crew's work, give orders to secure barges, and are responsible for safety of crew and equipment are supervisors even though 99 percent of jobs proceed with no supervision).
 
 
 24
 I believe that a close question is presented whether the captains either had the power to order or could effectively recommend the hire, transfer, suspension, lay off, recall, promotion, discharge, assignment, reward or discipline of other employees. The captains prepared employee evaluations, and there was evidence that suggestions in the evaluations were followed.
 
 
 25
 My dissent, however, is based on the captain's power "responsibly to direct" the other employees, which under the Act we must review separately from the other indicia of supervisory control. The tugs are sizeable ships up to 110 feet in length; the crews live aboard for extensive periods of time; and they are at sea for as long as three days. They travel substantial distances in a crowded bay involving countless safety considerations, from judging suitable weather, visibility, obstructions, other vessels, and delicate docking, to fastening and maneuvering huge barges and tankers.
 
 
 26
 The captains' testimony indicates that the captain requisitioned supplies; filled out evaluation forms on the crew members; corrected crew members if they were doing a job improperly; made sure that things were safe on the vessels; signed requests for repair work; filled out time logs and kept the logs of the vessels; ordered crew members away from taut lines and to cease leaning over the side of the vessels; decided if it was necessary to take the tugs back to shore; told crew members when another needed assistance, and directed them to stop what they were doing to assist another; directed crew members to pick up supplies; approved overtime work and, in cases involving safety, ordered such work without prior authorization; told crew members if they were doing something unsafe; made decisions to slow down in fog; decided whether vessels must come in for repairs; directed crew members to a specific dock; decided departure time; filled out accident reports; were responsible if something went wrong regarding safety; instructed the crew regarding safety; and received reports from crew members regarding safety. These examples provide ample evidence that the captains directed the crew members.
 
 
 27
 Further, the captains' authority to direct the crew required and utilized independent judgment. Many of the instances of direction involved the exercise of independent judgment in situations that were not routine, especially in regard to safety considerations. On-the-spot decisions and orders, which must take into account weather and conditions on the bay, are not routine simply because Chevron--like any responsible employer--has an established safety policy.
 
 
 28
 The captains had the responsibility to direct their crews, and were in charge when the vessel was at sea. The crew was not a democracy. As one captain testified, "Somebody has got to direct the boa." [RT p. 271] The Administrative Law Judge did not question the credibility of the captains who gave this testimony.
 
 
 29
 "[T]he resolution of an issue of supervisory status is entirely dependent on analysis of its own peculiar set of facts." Sun Refining & Mkt'g Co., 301 N.L.R.B. at 649 n. 12. The facts in this case are clear; in view of the substantial evidence of direction, the Board clearly erred in failing to conclude that the captains had the responsibility "to direct" the crew members and to make decisions requiring "the use of independent judgment." In fact, under the circumstances, it defies common sense not to recognize that the captains had to be in charge, with authority to make countless safety decisions and to direct the other crew members. It is not reasonable to suppose that the tugboats worked the bay for three days at a time with no supervisor aboard. See e.g., Schnuck Markets, 961 F.2d at 706 (not reasonable to find that company would operate large store for eight hours per day with no on-site supervisor). As the NLRB stated in Mon River,
 
 
 30
 Even if the boat captains' authority were substantially more circumscribed than it is, they would reasonably be found to be supervisors because otherwise "the Company's employees were entirely without supervision a large part of the time." It is inconceivable that employees on an around-the-clock operation for several days ... at a time would be left without present supervision.
 
 
 31
 173 N.L.R.B. at 1455 (internal citation omitted).
 
 
 32
 The Board's opinion referred to a captain's testimony that he spent only approximately five percent of his work time giving directions to the crew, and assumed the other captains also directed the crew members five percent of the time. [ER p. 15] That amount of direction alone is sufficient to confer supervisory status, which is not dependent on how frequently a supervisory power is executed, but rather on its existence. Walla Walla Union-Bulletin, 631 F.2d at 613.
 
 
 33
 McDonnell Douglas Corp. v. NLRB, 655 F.2d 932 (9th Cir.1982) (en banc), cert. denied, 455 U.S. 1017 (1982), cited by the majority, is not to the contrary. In McDonnell Douglas, we were confronted with the question of whether a transport pilot was a supervisory employee. The pilot usually flew alone, but on approximately five percent of his flights as pilot in command he had a co-pilot. We held that this was not enough to confer supervisory status. Id. at 937. In McDonnell Douglas, the possibility of supervision only presented itself five percent of the time, and the fraction of that five percent involving actual direction would be so minuscule a part of the whole as to be de minimums.
 
 
 34
 In holding that the transport pilot was not a supervisory employee, McDonnell Douglas distinguished on the facts a trilogy of the Board's previous decisions find that pilots were supervisors. See Douglas Aircraft Co., 207 N.L.R.B. 682 (1973); McDonnell Aircraft Co., 207 N.L.R.B. 684 (1973); and Lockheed-California Co., 207 N.L.R.B. 686 (1973). This trilogy of cases presents facts much closer to those in this case than does McDonnell Douglas. The pilots in the trilogy always flew with crews. They were responsible for the safety of the crews, the safe and efficient operation of the plane, and for the completion of all tests. The pilots also had authority to deviate from predetermined tests when necessary, instructed the crew members where and when to report for work, and granted time off. The NLRB found them to be supervisors by analogizing them to boat captains:
 
 
 35
 The direction which the pilot exercises over crewmen and other personnel aboard the plane is not merely routine or clerical in nature but involves independent judgment and great responsibility. Whether a test program or a flight will be successfully completed depends on the judgment of the pilot. A miscalculation on his part can result in injury or death to the personnel aboard the plane and to the damage or destruction of the plane. The pilot's authority and responsibility is therefore anything but routine.
 
 
 36
 The direction which a plane pilot exercises with respect to crewmen and other personnel aboard a plane is at least comparable to the authority which a ship's captain or pilot exercises as to ship's crew personnel. In a number of cases, the Board has found that ships' captains and pilots responsibly direct ships' crews and on this ground alone has found the captains and pilots to be supervisors.
 
 
 37
 Lockheed-California Co., 207 N.L.R.B. at 687 (footnote omitted citing Bernhardt Bros., Local 28, and Mardril, supra ).
 
 
 38
 Here, the tugboat captains, like the pilots in the trilogy, always worked with crews and had authority to direct the crews to ensure safety and in other matters. The Board found that the tugboat captains actually directed those crews five percent of the time, which is more than sufficient to confer supervisory status, and is entirely different from McDonnell Douglas, in which the crew was merely present five percent of the time.
 
 
 39
 In McDonnell Douglas we held: "For our purposes, a supervisor is one who uses independent judgment responsibly to direct other employees in the interest of the employer." 655 F.2d at 935. The captains of the Chevron tugs, as the facts demonstrate and by the very nature of their job, whenever required used their independent judgment to direct the other employees in the interest of the employer. The NLRB's holding that they were not supervisors is not based on substantial evidence.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or used by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The crew of the Standard No. 4 is on duty 24 hours a day for seven consecutive days, and off for the next seven days. The Chevron Richmond's crew is on duty for 24 hours, and off for the next 48 hours